UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| LEROY WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CAUSE NO. 2:20CV140-PPS |
| ) | |
| AMERICAN MULTI-CINEMA, INC. and ) | |
| AMC SHOWPLACE THEATRES, INC., ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

On September 5, 2017, Leroy Williams went to a movie at the Hobart 12 AMC Theater at Southlake Mall in Merrillville, Indiana. During the movie, Williams' seat suddenly broke without warning. Williams brings this action seeking damages for the injuries he suffered in the incident. Now before me is a motion for summary judgment by defendants American Multi-Cinema, Inc. and AMC Showplace Theatres, Inc. which I'll refer to as "AMC." Because no reasonable jury could find that AMC should have discovered the unreasonably dangerous condition of Williams' seat, judgment must be entered for AMC.

**Undisputed Facts**

The determination what material facts are undisputed is obviously critical in the summary judgment context, and Rule 56 requires the parties to support facts, and disputes of fact, by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1). This court's Local Rules in effect at the time the parties briefed the summary judgment motion required the moving party's brief to "include a section labeled 'Statement of Material Facts' that identified the facts that the moving party contends are not genuinely disputed." N.D.Ind. L.R. 56-1(a) (adopted Nov. 18, 2019).  AMC satisfied these requirements, with a Statement of Material Facts in which each asserted fact is supported by a citation to particular evidence of record.

Then-applicable Local Rule 56-1(b)(2) required Williams in his opposition brief to "include a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary." Williams did not comply with this requirement, instead offering a "Facts" section that sets out his view of the facts without identifying any specific disputes of the facts asserted (and supported) by AMC.  [DE 32 at 1-5.]  This suggests a refusal to plainly acknowledge facts that are not in dispute as required by the summary judgment procedure.  Williams' approach also off-loads to the court the work of sifting through the parties' rival contentions and the evidence to determine what material facts are genuinely disputed, when the briefing should have clearly identified those disputed facts.

By failing to directly dispute AMC's assertions of material fact made in compliance with the rules, Williams gives me the option to consider those facts

2

undisputed for purposes of the motion, pursuant to Fed.R.Civ.P. 56(e)(2). AMC's reply does not seize upon these procedural defects of Williams' opposition, but instead engages directly with Williams' own assertions of fact. On this record, I will begin my treatment of the facts by setting out the material facts asserted by AMC with evidentiary support, which are not disputed by Williams in his summary judgment response. Thereafter, I will address Williams' various attempts to establish disputes of material fact, each of which I find to be unsuccessful for the reasons I explain.

On September 5, 2017, Leroy Williams visited Auditorium 10 of AMC's theater in Southlake Mall to see the 7:30 p.m. showing of a movie called *Annabelle*. ]DE 6 at ¶4; DE 26-1 at ¶5; DE 26-2 at 53, ll. 10-16.][1] Before Williams sat in his seat, the cushion was in an upright position, as were the cushions of the seats to its left and right. [DE 2-2 at 55, ll. 18-23.] In order to sit in the seat, Williams placed his hands on the armrests of the seat, then moved one hand to push the seat down, and then sat on the seat. [*Id*. at 57, ll. 3-8.] In so doing, Williams did not notice anything unusual about the seat and heard no creaking or other noise from the seat. [*Id*., ll. 9-14, ll. 21-25.] Nothing seemed loose, and he didn't notice any indication of a problem with the seat. [*Id*. at 58, ll. 2-8.] For the next 90 minutes, Williams sat and watched the movie, and perceived no indication of anything wrong or unusual with the seat. [*Id*. at 59, ll.15-19; *id*. at 60, ll. 3-10.]

---

[1] I will cite to the record using the ECF document number and page numbers, rather than any page numbering internal to the document.

Williams has described what happened next: "Without notice and without moving around, the seat to my chair abruptly broke and I fell to the ground hitting my tailbone." [DE 26-2 at 60, ll. 18-25.] The photo Williams took of the broken seat shows the cushion no longer at a right angle to the backrest, but hanging straight down from its hinge. [DE 26-3.] Williams agrees that he does not know how the seat broke or what was wrong with the seat that caused or allowed it to break. [DE 26-2 at 61, l.23 - 62, l. 2.]

Courtney Scharnagle, the General Manager of the theater, has attested that "AMC ushers are trained to and do clean the movie auditoriums after every single movie showing - which means that each auditorium is cleaned and inspected multiple times each day, including the floors and seating." [DE 26-1 at ¶8.] According to Scharnagle, this function includes walking "through each row in the auditorium, inspecting the seating for any debris or problems." [*Id.*] Scharnagle claims that she "instructed the AMC ushers to look for and report any problems with any auditorium seat," as directed in AMC's "On-the-Job Training Checklist" for ushers. [DE 26-1 at ¶9; DE 26-4 at 10 ("Check for any damaged seats. If they cannot be repaired/cleaned immediately, cover with AMC 'Out of Service' slipcovers.").] Scharnagle attests that approximately every other week, she would remind all ushers to look out for and report any repairs needed in any auditoriums, including any issues with seats, and that about twice each year, she would conduct a "crew summit" with follow-up training on auditorium maintenance. [DE 26-1 at ¶7.]

4

The Southlake Mall theater's facilities manager, Charles Talley, reiterates these assertions about ushers being required to regularly examine the auditorium seats. [DE 26-4 at ¶¶6-7.] Talley and Scharnagle both attest that an existing dysfunction of the seat cushion's platform, or "bucket," is usually obvious because when the seat is unoccupied the bucket/cushion would not return to its usual near-vertical position. [*Id*. at ¶8; DE 26-4 at ¶12.] In his more than 8 years with the theater, Talley has never heard of any other instance of a seat at the theater breaking in this manner after the cushion was resting in an upright position before the customer sat down. [*Id*. at ¶10.] Neither has Scharnagle in her approximately 15 years managing AMC theaters. [DE 26-1 at ¶¶2, 14.] In the seven days prior to the Williams incident, given the number of movie showings, ushers had conducted at least 24 inspections of Auditorium 10. [DE 26-1 at ¶10.] Before the incident experienced by Mr. Williams, there had been no reports of a seat in Auditorium 10 that needed repair. [DE 26-1 at ¶¶10, 15; DE 26-4 at ¶11.]

In his deposition, Williams testified that immediately after the incident, he spoke with an unnamed AMC supervisor. [DE 31-3 at 2, l.25 - 3, l. 3.] Williams asked whether AMC personnel check the theater seats, and the supervisor said that they don't. [*Id*. at 3, ll. 6-10, ll.17-19.] Williams also asked whether "this" had happened before, and the supervisor responded, "yes." [*Id*. at 3, ll. 19-20; *id*. at 4, ll.16-17.] In reply, AMC argues that Williams fails to demonstrate that the statements of this unidentified person can avoid the hearsay bar either because Williams hasn't shown that the unknown person

5

was authorized by AMC to make a statement on the subject (Fed.R.Evid. 801(d)(2)(C)); nor has he shown that the statements were made on a matter within the scope of the speaker's agency relationship with AMC (Rule 801(d)(2)(D)).  [DE 34 at 5.][2]  AMC also contends that Williams' evidence on this point does not establish that the AMC employee had personal knowledge about the inspection of auditorium seats generally and about prior incidents like Williams'.  [*Id.*]

I agree that, for those reasons, Williams has failed to establish that the statements by the unnamed AMC supervisor are admissible in evidence, as required by Fed.R.Civ.P. 56(c).  Williams' reliance on the hearsay exception for statements against interest in Fed.R.Evid. 804(b)(3) [DE 32 at 10] is not successful because Williams does not demonstrate that the mystery employee is unavailable as a witness or that the statements meet one of the rule's definitions of the speaker's (as opposed to AMC's) adverse interest.  Even if admissible, the bare responses, as to which there was no elaboration, do little to create genuine disputes of material fact concerning whether Williams' seat had been meaningfully inspected or whether any defective condition of the seat should have been discovered by AMC.

Williams tries to make something out of evidence that the seat was repaired after the incident using "in-house" replacement parts.  [DE 32 at 3-4.]  But so what?  Williams

---

[2] In his opposition, Williams claims that the supervisor in question was named Marcus Jackson. [DE 32 at 2.]  But Williams does not cite any evidence supporting this identification, or further explain the individual's supervisory role.  [*Id*; DE 34 at 5, n.3.]

suggests that having replacement parts on hand supports an inference that AMC was "aware the chairs need maintenance and/or repairs." [DE 32 at 11.] AMC rightly points out that AMC's supply of unspecified replacement parts (which may after all be merely assorted nuts and bolts generally wise to have on hand for multiple purposes) does not logically support a conclusion that AMC had actual or constructive knowledge of the condition of Williams' seat on the day in question. [DE 34 at 12.]

Williams argues that AMC has not offered proof that any of its alleged policies or protocols were actually followed, such that Auditorium 10 or the particular seat had actually been inspected. [DE 32 at 4.] Of course, the affidavit of the theater's General Manager Courtney Scharnagle is some evidence in support of a conclusion that the seat had been subject to repeated inspections in the days preceding, and even the day of, the collapse of the seat. Under Fed.R.Evid. 406, evidence of "an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the...routine practice." Also AMC's answer to Interrogatory No. 18 (quoted by Williams in his opposition) asserts that "at the time of the incident, thirty minutes before each movie showing begins, ushers visually inspect the auditorium seats while sweeping each row" and that "if a seat is sagging or does not bounce back-up, a defect with the seat 'bucket' would be noticeable." [DE 32 at 4.] Each of these is evidence of the sort that Williams claims is absent.

7

Williams further contends that AMC theater maintenance schedules and worksheets suggest that a file is to be kept at the facility documenting the inspections actually performed, but that no such documents have been produced. [DE 32 at 5.] But AMC persuasively replies that, to the contrary, the document Williams relies on [DE 31-5 at 1] requires only that AMC's policies for daily opening and closing duties, as well as weekly, monthly and quarterly maintenance duties, be kept on file at the theater, but not that a record be kept of the daily performance of required inspections. [DE 34 at 7-8.]

Williams points to an AMC Facility Evaluation of the theater dated April 5, 2017, five months prior to the collapse of his seat on September 5. [DE 31-6 at 2.] This evaluation reflects a composite score of 63.4% for "Auditoriums." [*Id*.] The seats were found not to meet expectations, with the notation that several seats were broken, but have been fixed. [*Id*. at 6.] The "Theatre Priority List" includes "Have broken seats repaired as discussed." [*Id*.] The "Status" shown for that line item, dated May 14, is "Broken seats have been fixed by Charlie." [*Id*.] The same sort of Facility Evaluation dated October 19, 2017, approximately 6 weeks after the incident at issue here, reflects a composite score of 74% for the theater's auditoriums, with the seating again not meeting expectations. [DE 31-7 at 2, 6.] But the comments indicate that all seats were "in working order" though stained and worn. [*Id*. at 6.] Although these evaluations of the theater suggest that the condition of its auditoriums in April 2017 and October 2017

8

was nothing to be particularly proud of, this evidence does not make it more probable that Williams' seat on September 5, 2017 was in disrepair, and more particularly that it was in a state of disrepair that AMC should have been aware of.

## Discussion

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A motion for summary judgment has been described as the time in a lawsuit to "put up or shut up." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, not every dispute between the parties makes summary judgment inappropriate. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*.

The parties agree on the legal standard that applies to Williams' claim of negligence as a business invitee in defendants' movie theater. Under Indiana law, applicable here:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

9

>    (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>    (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>    (c) fails to exercise reasonable care to protect them against the danger.

*Griffin v. Menard, Inc.*, 175 N.E.3d 811, 813 (Ind. 2021) (quoting *Burrell v. Meads*, 569 N.E. 2d 637, 639 (Ind. 1991), quoting RESTATEMENT (SECOND) OF TORTS §343 (1965)).  On the undisputed facts, Williams is unable to demonstrate that he could persuade a jury at trial to find two required elements in his favor.

First, Williams has not identified any admissible evidence to support a conclusion that by the exercise of reasonable care, AMC would have discovered any defective condition of Williams' seat.  No evidence has been proffered to explain what caused Williams' seat to break as it did.  Furthermore, no evidence has been proffered to support a conclusion that reasonable inspection of the seats in Auditorium 10 would have enabled AMC to discover that condition, whatever it was.  As Williams himself acknowledges, the seat collapsed without warning.  No defective condition of the seat was observable by Williams even as he lowered himself into the seat and sat in it for 90 minutes.  There were apparently no visual clues that the seat was in a precarious condition, nor any sounds or sensations that signaled weakness or an imminent failure.  Williams cannot demonstrate that "by the exercise of reasonable care," AMC "would discover" an unreasonably dangerous condition of the seat.

The second element required of Williams, but that he is unable to support, is a showing that AMC "fail[ed] to exercise reasonable care to protect [invitees] against the danger." I have found that Williams fails to create a dispute of fact about the regularity of AMC's protocol for reasonable inspections of the auditorium seats. Williams is therefore also unable to demonstrate that AMC failed to exercise reasonable care to protect him from a defect that the evidence suggests was imperceptible.

**Conclusion**

Leroy Williams argues that AMC had a legal duty to "ascertain the true condition of its seats." [DE 32 at 12.] But "there is no duty to insure a business invitee's safety while on the premises." *Schulz v. Kroger Co.*, 963 N.E.2d 1141, 1144 (Ind.Ct.App. 2012). With respect to premises liability, the Indiana Supreme Court has very recently declined to impose duties "to have certain policies, conduct certain inspections, or keep records of the same." *Griffin v. Menard, Inc.*, 175 N.E.3d 811, 814 (Ind. 2021). Instead, AMC is not liable for injuries to Williams unless a reasonable jury could find, among other things, that AMC would have discovered an unreasonably dangerous condition of Williams' seat if it had exercised reasonable care, and that AMC failed to exercise such reasonable care. Because at this "put up or shut up" stage of the lawsuit, Williams fails to show that there is admissible evidence that could support such a verdict, AMC is entitled to summary judgment.

**ACCORDINGLY:**

11

Defendants' Motion for Summary Judgment [DE 25] is GRANTED.

The Clerk shall enter summary judgment in favor of defendants American Multi-Cinema, Inc. and AMC Showplace Theatres, Inc. and against plaintiff Leroy Williams.

The scheduling conference previously set on July 19, 2022 is VACATED, and the action is CLOSED.

**SO ORDERED**.

ENTERED:   June 27, 2022.

    /s/ Philip P. Simon
**UNITED STATES DISTRICT JUDGE**